Good morning, your honors. May it please the court. Matthew Dowd on behalf of the Steinbeck defendants, including Thomas Steinbeck, the late son of the author John Steinbeck. I'll keep an eye on the clock with the goal of reserving about four minutes. Your honors, I'd like to turn first to the 304c5 issue and then if we have time I'd like to talk about the damages issue both issues both in terms of damages issues. So with respect to the first issue, excuse me, one of my first responsibilities here today is to convince the panel that the particular issue that was raised in this case was not previously decided by any of the earlier cases. How do you get by our panel decision that says we did? Judge Tolman, that's my biggest hurdle. I'll admit that. You know it isn't that law of the case? Here's one answer to that. So think about what this... We're talking about the enforceability of the 1983 agreement, right? Pardon, your honor? We're talking about the enforceability of the 1983 agreement. Correct, vis-a-vis 304c5. Right. And I have a few points on that. First of all, with respect to the claims that were presented in this case being appealed, we have, there were two court claims and a breach of contract claim. And so if you accept that the 304c5 issue was never finally decided until this court's non-precedential decision in 2017... Well you say non-precedential, but it is clearly binding on the parties in this case, whether it's published or not. That's our rule. Correct, Judge Tolman. I don't mean to mean that you could just disregard that because it's a for a couple reasons, but let me get to the first point. Is that when this case was filed in 2014, right, if you accept that the 304c5 issue wasn't finally decided until this panel, this court's decision in 2017, then the Steinbeck defendants should have been allowed to present evidence and argument with minimum their belief about their termination rights. But I thought that the trial court allowed them to talk about the fact that they believed that those, that the New York court decisions were wrong and that those issues had not been decided. Judge Tolman, I respectfully, I disagree with that because if you look at the August 25th, 2017 order of Judge Hatter and that this goes to the litigation order, and so throughout the record and throughout the trial transcript, you'll see numerous instances of objections being held upon the basis of the so-called 2004. And I read those provisions, but I also saw that some of it, I'll call it leaked out. I mean there was, he did permit your clients to testify as to their beliefs, although he limited how much they could testify and lawyers and that sort of thing, did he not? On a few instances, you're correct, Judge Holman, but I think the bigger question goes to both the decision on summary judgment, the re-litigation order precluding, and and Judge Hatter was clear. He expressly says all evidence, testimony, and argument with respect to the termination rights. And so if you couple that with respect to what happened once Gail's attorney entered this case and attempted to provide adequate briefing on this issue, and this was the motion for reconsideration, Mr. Berger, who was Gail's counsel at the time, he actually got sanctioned for submitting that motion. And it wasn't a perfect motion, but it was certainly a reasonable motion because Gail, prior to that, had submitted an opposition to the motion for summary judgment or partial summary judgment. And when you take a look at her submission, it's clearly not fairly presenting the complex issues here. So, but again, going back to... The problem is you want to re-argue the determination that our prior panel made. I mean, we say in our memorandum decision that the district court dismissed the action, finding it barred by collateral estoppel issue preclusion. The Second Circuit squarely held that the 1983 Settlement Agreement is unambiguous and forecloses any argument that the parties intended the Sons to retain control over the exploitation and or termination of rights in the works of John Steinbeck, and that the 1983 Settlement Agreement binds the parties. And then we affirmed the district court's ruling. Doesn't that squarely dispose of the issue and make it the law of the case? With respect, Judge Talmadge, I disagree for several reasons. First, if you look at the briefing with respect to the motion to dismiss on the parallel litigation, and this is the case that you're talking about, the estate, my colleagues on the other side, when they moved to dismiss, they never raised collateral estoppel. That was not one of the reasons that were... But even if that all occurred, it doesn't make any difference if that's the holding of the prior panel of this court. You're asking us to essentially go back and revisit the issue that the court expressly determined, and I don't know how we can do that. Your Honors, well let me take you to what exactly happened in the Second Circuit and those five cases and try to explain why none of those cases actually decide that... Let me ask the question a different way. Assuming that the Southern District of New York and the Second Circuit Court of Appeals were dead wrong, the problem you face is a binding Ninth Circuit decision affirming the trial court's ruling that the 1983 agreement is binding. So it doesn't really matter what was presented or decided in the eyes of your client. We now have a ruling from this court that says that it is binding. The other Ninth Circuit decision said it was decided via collateral estoppel. And if you go... The problem comes... I mean, I'm going to go one further than Judge Tallman. This is all admitted or excluded on an abuse of discretion basis, and now you're trying to parse through these decisions. When we got a Ninth Circuit decision dead on saying what it has to say, whether you say collateral estoppel, whether you say something else, this court now has to review their decision on an abuse of discretion basis. I'm having a tough time saying that anything that the judge did here was an abuse of discretion, even if I accept your argument. Judge Smith, respectfully, one point of disagreement is that part of what we are appealing is Judge Hatter's summary judgment ruling. Okay. And so his summary judgment ruling... We're talking on the summary judgment on the breach of contract? Correct, Your Honor. And the slander? Correct, Your Honor. Okay. So let's take those two, because obviously that's a Danover review, a little more favorable for me. Yeah, I was going to say, we're going down through... We're clear down to C now. Right. So if I may, for a moment, let's put aside the Ninth Circuit decision and look at what Judge Hatter decided on summary judgment. And again, in that decision, he says that in the cases in the Second Circuit, they squarely decided, he said, law of the case, whether it's law of the case or collateral supplement. So the issue that we have to look at is whether this particular issue, whether this 1983 agreement is, quote unquote, any agreement to the contrary, was previously decided. There were five decisions in the New York courts. I'll go through them very quickly. 2006, Judge Owen rules in our favor, actually, on this very issue. Then in 2008, Judge Sack, writing for the Second Circuit, reverses. But in that very decision, he notes that there's a question about the validity of the 83 agreement if it were to be enforced, as the estate says. Then it goes back down to the SDNY. It's reassigned to Judge Daniels. He writes two opinions. One is not particularly relevant, but the other is unreported decision 2009-928-189. And when you look at that decision, in footnote 10, Judge Daniels expressly says that this particular issue was not decided. So then you go back to the last decision from New York, which is the 2010 decision from the Second Circuit. There are only two issues decided in that. One was fraud fiduciary duty claim, and one was promissory estoppel. Now, what the estate says is that, well, that decision doesn't matter because we stipulated to an agreement with respect to the validity of the 83 agreement. Now, I'll turn you to SCR 181 in the record. And the court knows that in many instances, collateral estoppel cannot be based on stipulated judgments, admitted facts, etc. You have to look at what the stipulation says. And in that stipulation, the parties say that they're agreeing to one thing. They're agreeing only to the validity of the 83 agreement as it was set forth in the 2009 decision by Judge Daniels. And again, that's 2009, Westlaw, 928-189. Can I ask you a question about the Second Circuit opinion, or one of them? I guess this is the 2008 Second Circuit opinion. Yes, Judge. And it says that the 1994 agreement terminated and superseded the 1938 agreement, leaving, in effect, no pre-1978 grants to which the termination rights provided by Section 304D could be applied. When I was looking at, I was trying to see the applicability of this statute, and they both seem to relate to pre-1978 grants, which the Second Circuit says are now gone. How does that affect the analysis? So if the Second Circuit's ruling has collateral estoppel effect and says there are no pre-1978 grants to which termination rights could be applied, does that eliminate the merits argument? Not at all, Judge Akuta, because if I understand your question, if I understand what portion of the opinion you're referring to, we're talking about different grants for the underlying rights. And so in this case, we're talking only about the grant for filmmaking. Again, that particular claim or issue was not decided in any of the New York cases. And so going back to what I was saying with respect to what the courts decided, we have five decisions from New York. So the 1994 agreement only related to non-filmmaking rights, is that what you're saying? Correct, Judge Akuta. Those are primarily to – I don't recall if it was only, but it was primarily to publishing rights with Penguin. And would analysis be any different for other rights, since they were all granted at the same time with the same copyright – under the same copyright rules? You have to take the analysis for each grant. And the 1994 agreement, what the court said there, was that the 1994 agreement effectively washed away any particular termination rights. There's no question in this case with respect to the Grapes of Wrath, and particularly with respect to East of Eden, which has never been properly terminated. The 1938 agreement, as I understand it, was to Penguin and Viking, was for all of the, I guess, the rights, the book rights. I don't know if they were thinking of film rights at that point. And this says that the 1994 agreement terminated and superseded that agreement. With respect to the book rights, but then in 1939, there was an agreement to 20th Century Fox for the film rights. And so that's what we're talking about in this case. And it just underscores the fact that what we're arguing here and what our clients tried to present with respect to affirmative defenses, or more particularly with respect to opposing summary judgment, is that there has been no decision that has said one way or the other that the 83 agreement is not or is an agreement to the contrary. That's an unsettled issue. And on top of that, we have three New York cases that actually suggest that there's a validity problem or an enforceability problem if you read that decision to mean that. But how do you square that with our prior panels holding that it forecloses any arguments that it intended the Sons to retain control over the exploitation and or termination of rights in the works of John Steinbeck? With reference to the 1983 agreement. So a few things on that, Judge Talman. And this really does get into subtlety and part of the difficulty and confusion associated with just this particular clause in 304C5. And so courts have not been particularly clear whether you look at it from a state law contract or there's preemption issues. You have in this circuit itself, if you read or when you read the decision in Milne and you compare it to the analysis in Meabourn, those two are hard to reconcile. And so if you look at that decision from the Ninth Circuit panel saying, well, this is what the courts in New York decided, what they're saying is that it was a valid contract, meaning that there was a meeting of the minds and that there was consideration and there's no validity issues of it, but it doesn't decide the ultimate enforceability of it. I'll tell you what's really bothering me about this case. It's beginning to take on the appearance of bleak house. This litigation has been ongoing now for, what, 40 years, approaching 50. The parties are dying. They're being replaced by successors who in turn are dying. And there's just no end to it. I mean, why shouldn't the fair resolution here be to respect the decision of the prior Ninth Circuit panel, close the door on any further argument with regard to the 1983 agreement, and affirm the decision by the jury that there was active interference that was unwarranted by your clients in the attempts by the estate to exploit its rights under the works of John Steinbeck? Judge Talman, the simple answer to that is that this is the provisions and this is the statute that Congress has established. And for better or for worse, in 1976, Congress said that these termination rights are inalienable. And I understand your concern here, but the simple fact is that this is going to arise in the future. You're going to have these fact patterns, and you can't dismiss them simply because we're looking at events that happen. And, in fact, this is exactly what happens in Milne. It's exactly what happened in Meuborne. In both of those cases, and particularly also in Marvel Characters v. Simon, that was the case dealing with Captain America. And, in fact, that case is very similar to the situation we have here because in 1966, in 1969 in that case, Mr. Simon had settled a dispute with Marvel Characters. And then after 76 with the termination rights, when they arose, new litigation, the court in that case, and this is at 310 F. 3rd, 291 to 292, the court said this is how you deal with the collateral estoppel issue. If you want this finally resolved and you're going to settle a case, submit to the court stipulated findings, a clear statement, saying that this is what the parties agreed to, this is what's being agreed to, and we're not going to litigate this moving forward. But here we don't have that. Maybe you ought to move to the second issue about punitive damages. It seems to me we know your argument now, where you are, and we've examined you quite a bit. Maybe you move to your punitive damages issue. Thank you, Judge Smith. On the punitive damages, I think this, again, it relates to the type of evidence that could have been or should have been allowed to be presented. I don't think there's any question with respect to punitive damages that intent is a relevant consideration. So going back to the erroneous decision in terms of excluding evidence, I'll leave it at that. But more importantly, under California law, it's the burden of the party seeking punitive damages to enter into evidence by clear and convincing evidence, evidence about the defendant's wealth and status. We don't have that here. That by itself. What do we have here? What kind of motion are we really looking at here? We've got to give the evidence. This is a motion for the judge to say the jury doesn't know what the jury considered. There's no substantial evidence to suggest that it ought to get there. And so we have to give some benefit of the doubt to the jury. So I'm having a tough time understanding why there isn't substantial evidence about the fraud or the malice given what's in this particular record. But I think you have a better argument about financial ability. If, in fact, there is not enough evidence about financial ability to pay, can I just wipe away the punitive damages or do I have to send it back to the district court for a decision as to what is an appropriate amount? Judge Smith, the simple answer to that is that the damages get vacated because it's a failure of proof on the part of the plaintiff. And this is clear. It's a failure of the financial proof. Correct. It isn't a matter of what if I can suggest that there's substantial evidence of some financial ability? Then at that point, don't I have to return this case to the district court to determine the amount of the damage? Your Honor, I think you still have to look at it through the lens of clear and convincing evidence. But two things on that. I don't think you could find a single case where a California court or a court in this circuit applying California law has upheld a punitive damages award against an individual in which the amount of the award are hundreds of multiples or scores of multiples of the… I figured it at about 64 percent. So meaning 164 percent of the defendant's wealth. 64 percent, assuming that we know the wealth. Most of the California cases… You're caving in if you say we know the wealth. Your argument is we don't know. I was just asking a question. Absolutely, we don't know. The only piece of evidence that we have in this case is Gail's statement that she may make $120,000 to $200,000 per year. That varies. But I think to Judge Tallman's point, that is not evidence of wealth. That's evidence of income. So I think your number, you're referring to that baseline income. Actually, it was a soft pitch to you because I couldn't find a case where reversal was not ordered when it exceeded 10 or 20 percent of the defendant's net worth. The problem, as you point out, is we really don't know what her net worth is. All we know is how much she was making in royalties off of, I guess it's the books. But let me ask you a related question, and that is what's the remedy here? Do we remand for remitter by the district court and then give you the choice that you either pay the reduced amount on remitter or you get a new trial as to damages? So a new trial just to punitive damages? Yes. I don't believe that's the proper approach under California law. You think California law applies because if that's the case, when a California court says there's insufficient evidence in the record to support the punitive damages, then it reverses the judgment. It remands to the trial court for a determination. So if California law applies, then I guess we would do the same to the district. We would return to the district court and allow for an evidentiary hearing. The cases I'm seeing in my notes are Dumas and Adams holding that. Your Honor, if that's your reading of it, I won't disagree with that. But what I will say is that there is no further evidence. The plaintiff doesn't get a redo of providing evidence. The case has been presented. They've had a failure of proof on that element of punitive damages. What I tried to do with my question, maybe it was inartful, and these two have made more artful questions, it seems to me that when we're considering punitive damages under the California law, if there is no evidence of punitive damage, we just say there won't be any punitive damage. But if there is some evidence of punitive damage but it's just excessive, then we would remand it and ask the district court then to determine what would be the appropriate. Isn't that the way the California law is? Again, Your Honor, I don't think so, but let me just say this. If that's the outcome of this case, we have something along the lines of $5 million in compensatory damages. We haven't talked about that, and we'll pass on that. But if simply the remand here is to say compensatory damages stand, the almost $8 million in punitive can't stand, but we'll have a remand to see whether Gail, who makes no more than $200,000 per year, can afford some tens or 20,000 of punitive damages. It's just not an efficient use of resources. I understand the legal argument in terms of what the law might require, but. . . Well, we would have to find that there was insufficient evidence to support the actual award of punitives. Correct. Assuming that we decide that there was, then it's a pretty narrow issue on remand, and that is what is a fair amount of punitive damages in light of the defendant's net worth and ability to pay, and the district court would be in the best position to determine what evidence, if any, there is to address that issue. Right. I think you're right, Justice Hellman, but I think my ultimate point is that it would be sort of a nullity at this point, given what I know about Ms. Steinbeck's financial status. You're well over time. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, Susan Coleman from Jenner and Block on behalf of Waverly Cofaga, the executor of the estate of Elaine Steinbeck. Let me start by trying to clarify. Your Honors are completely correct that the agreement to the contrary issue has been litigated, and there is collateral estoppel in effect here. Just to clarify, I think perhaps some confusion about the termination law, because my opposing counsel suggested going back to summary judgment. The Second Circuit absolutely decided the issue of whether the 1983 agreement was a valid and enforceable agreement. There is no question about that. What the Second Circuit said is that Elaine was given unrestricted right to negotiate whatever contract she wanted, even if its terms were considered less favorable than what the defendants desired, and said, moreover, that it was okay for the Court to determine Blake Smiles' right. So the Court held this was precisely what Elaine Steinbeck was empowered to do under the 1983 agreement, which expressly banned Blake Smiles as John Steinbeck IV's successor in interest. Blake Smiles' consent was not required for the exercise of Elaine Steinbeck's authority under that agreement and any attempt by the granddaughter to exercise rights transferred to Elaine Steinbeck under the 1983 agreement. Whether it was promissory estoppel, whether it was agreement to the contrary, the Second Circuit decided that the 1983 agreement was valid and enforceable. The opposing counsel referred to the stipulated judgment. The stipulated judgment occurred before the Second Circuit decision. The stipulated judgment occurred in 2009. The Second Circuit's decision came in 2010. That stipulated judgment, in which Tom Steinbeck and Blake Smile were represented by counsel, said that they could not contest the provisions of the 1983 agreement. So you have the Second Circuit decision, which was issued in 2010, and you have the stipulated judgment. Then, as your honors have pointed out many times, you have this that is bound by this Circuit's decision concerning collateral estoppel. I do think that it is, however, even if you were to take all that into account, it is a complete red herring agreement to the contrary because there was nothing to terminate. The fact that there was nothing to terminate does not really have anything to do with the Second Circuit's decision with respect to the 1994 publishing agreement. There was nothing to terminate, and the record is clear, with respect first to East of Eden. Now, opposing counsel was a bit confused about whether it's film rights or book rights. The way termination rights work is that you look to when the work was copyrighted. With respect to East of Eden, it was copyrighted in 1952. The way the termination provisions of the Copyright Act work, you add 56 years. That gets you to 2008. There is a window to terminate between 2008 and 2012. And notice, sorry, 2013. Notice must be given. Excuse me? I was going to say 13. Yeah, it's a reason. I'm following your argument. Okay, thank you. And notice must be given by 2011. So the time to give a notice of termination with respect to East of Eden had passed. Yes, what would have been terminated was a license grant with respect to a film, but that's irrelevant. That is granting a license from the book to use the book to make a film. But that's not the only reason it's a red herring. As the record will show, there had been a prior agreement in 2004 in which the movie studio returned the rights essentially to the heirs because they wanted to be able to continue to show the old movie, but they couldn't do a remake or anything like that. So for two reasons, East of Eden is a red herring. An old movie of Grapes of Wrath. East of Eden, Your Honor. We're speaking about East of Eden. With respect to Grapes of Wrath, the courts and the copyright statute is very clear. There is only one, you only get one shot to terminate. So with respect to Grapes of Wrath, Elaine terminated the Grapes of Wrath agreement in 1998. And ironically, in this case, she terminated the Grapes of Wrath agreement under the 1983 agreement. And at least with respect to that termination, of course, Tom Steinbeck and Gail Steinbeck and Paladin are very happy to have the agreement enforced because Elaine Steinbeck, on behalf of the heirs, effectively terminated the Grapes of Wrath and those rights therefore returned to the heirs. And that's the whole reason why they were able to try to negotiate for a new movie deal with respect to Grapes of Wrath. Agreement to the contrary is irrelevant. But in any event, what you would have here if the court were to agree that somehow the summary judgment motion was inappropriately granted, is you would enable parties to just keep litigating and raise a new theory every time they came up with some new idea. That's not the case here. We've litigated agreement to the contrary ad nauseum, and that just can't be the law. And all of what I have described is in the record, and so I think I'm going to turn to punitive damages. With respect to punitive damages, first of all there was, and I think Your Honors will find in our brief, I'm happy to go through it, but numerous instances of malice and fraud. If ever there was a case where we needed punitive damages to be awarded, it is this case. Okay. Are you referring to, I'll call it the substantive violation that results in warranting punitive damages? I'm not concerned about that. My concern is with regard to proof of the defendant's net worth and ability to pay. I will turn then to defendant's net worth and ability to pay. I mean, and what I wanted you to think about, too, is not only is Judge Tallman articulated an appropriate concern, but the concern is what the motion was brought. It was a motion brought after the jury had already made these determinations. So now the standard of review as to making that motion is especially important in determining this particular issue. Yes, Your Honor. And I would submit that there was record evidence of Gail's financial condition. What? Meaningful evidence. First of all, she testified that they have gotten $120,000 a year, and that was her low estimate from domestic book royalties. That's at ERO 259 and 270-271. Two hundred. Well, she testified that in the prior year she had received $200,000. I understand. And that there were years when ---- What about the income? Well, Your Honor ---- Where were the liabilities? With respect to liabilities, she testified there were no liabilities. She testified she had no children. That's at ERO 232. No dependents. That's at ERO 1153-54. She couldn't live on $120,000. Because she had kids in college. Well, I think the record will reflect that if you look at ERO 232 and ERO 1153-54 and the tax returns that she and Tom Steinbeck submitted, those are not her children. In fact, there's no evidence in the record about who those children were. I understand. I'm just trying to put ---- I mean, if I'm going to have a net worth, I'm going to figure out what the net worth was. And I saw an income stream, but I didn't see anything else. I saw that they were working on several films and television series, but they were only paid when the film was either optioned or the license was exercised. I saw that Tom's books were not profitable. I could see that she couldn't live on $120,000 because the kids were in college. I saw she didn't own a house. I saw she does not have outstanding liens or loans. That's all I saw. Well, with all due respect, Your Honor, I think the jury heard the financial condition testimony differently. I don't think ---- I was reading it. Well, I think if you look at the testimony, I don't think that she did. In fact, ultimately, I think the testimony is clear that those are not her. She has no dependents, and the testimony ---- and she had no mortgage. Net worth. I mean, the California cases speak of that phrase, which, in my experience, normally means a forensic accountant gets on the stand and testifies that I've made an analysis of income and expenditures, I've made an analysis of assets and liabilities, and I conclude that the defendant has a net worth of X and an average annual income of Y. And I don't see that in the record here. Well, Your Honor, I ---- Have you seen something? I think that there is not that kind of information. The best we could get out of the appellants here when we were doing discovery was incomplete tax returns. It was our burden, but we would submit that we met our burden, and they did call Gail Steinbeck back and could have actually revisited the issue and put in testimony. The burden is on you. The burden is ultimately ---- Well, did you seek to compel further production of ---- There were innumerable discovery motions, suffice it to say, Your Honor. But let me also say that in the Ninth Circuit, financial condition is just one of several factors. There is no bright line. And here I would submit that the ---- Aren't we abiding California law? I mean, I appreciate what we said generally in Ninth Circuit jurisprudence, but the California courts are pretty specific in terms of what the plaintiff must show. I believe that we have shown here as best we can both liabilities, income, and future earnings. If we disagree with you and think that there was insufficient evidence in the record, what's the remedy under California law? My understanding is that we would reverse the judgment and remand to the trial court for determination. I would submit, Your Honor, that if the court disagrees with us, that there is sufficient evidence of financial condition here, that the Ninth Circuit remand with a remitter and there be no additional trials or ---- I thought that it's remitted and or a choice by the defendant as to whether to accept the remitted amount or to go have a new trial. I guess it would be limited to damages and ability to pay on the punitive damages award. Isn't that what the California cases suggest? Yes, Your Honor, but I think under ---- the plaintiff was awarded $800,000 and the award was appealed, and the court only reviewed the district court's denial of the motion for a retrial and remitter, and so I think the court then ordered just what you're suggesting, either a new trial or remitter. I think here, as Your Honor has said, there has been enough litigation. My client alone has been litigating for 15 years and to set this back down for a new trial on the issue of punitives when the malice and utter disregard for the cases and the rulings that have come down couldn't be clearer. What I hear you saying is we got what we got, and there really isn't anything more that we would be able to offer the district court to answer the question of net worth and ability to pay on remand. I think that's right. I'm sure we would be able to definitively show that there are no children. I'm sure we would be able to definitively show that once Gail Steinbeck is no longer able to interfere here, there will be movies of these great works. Ironically, right now, that revenue goes to Gail Steinbeck, so I think there are future earnings, and just to be clear, this is not someone who has a job and is working to No, no, we understand that. So this is just royalties that she's getting. Royalty is book royalty, though, right? No, no, it's royalties from everything. I mean, that's exactly the issue.  Sorry, Your Honor. Are you saying that if it's determined finally that there are no further termination rights and she's no longer able to prevent these deals from going forward, then her income would potentially be much higher based on royalties from these completed deals? Is that correct? Well, right now, Your Honor, Gail Steinbeck, as the wife of Tom Steinbeck, receives royalties on the works. That includes, and it is only the later works, but that includes if a movie is done, a TV series is done, whatever it might be. That's why she was so interested in doing a secret side deal for Grapes of Wrath. Once she is finally precluded from interfering and we can exploit these rights freely, that money will come in. We have actually tried to make a motion, which has been stayed pending the outcome of this appeal, that those royalties should come to my client. She should not get the benefit of those. Those would be royalties we would attach to pay for the damages. But, yes, I mean, she could get millions of dollars for all we know. And I would submit she testified to her future earnings. She said Paladin had four TV series and six feature films in development. So I don't think sending it back to your Honor's question, I don't think sending it back down is going to add to the record here. Let me look at this a little bit different. Judge, you could ask your question that it would be the normal California law in this situation to send it back, to have the district court decide this. It seems to me, reading Kelly v. Hugg, which is a California case, quoting Adams v. Murakami, that if there is insufficient evidence of the punitive damages, that the retrial would be improper because the reversal is based solely on the insufficiency of evidence and the plaintiff is not entitled to another bite at the apple. The only time we would return it back is if we found there was evidence thereof but that it was excessive. Now, it seems to me that quite on the other hand, in this particular case, there's not evidence. If we're going along with what the plaintiff's saying and I'm looking at the evidence, there's no evidence of financial condition. At that point, it seemed to me we just say no punitive damages in this particular case. On the contrary, Your Honor, I think that— What case says that I would do different? Because I'm quoting to you Kelly v. Hugg, I'm quoting to you Adams v. Murakami, and I quoted you the language. The retrial would be improper because reversal is based solely on the insufficiency of the evidence and the plaintiff is not entitled to another bite at the apple. Absent a full and fair opportunity to litigate the issue, it was proper to reverse the punitive damages award without remanding for retrial. I think, Your Honor, in Adams—and in that case, Adams sued her doctor, Murakami, for medical malpractice. My understanding is that at trial, neither side introduced evidence of Murakami's financial condition. I'll be fair with you. I don't think either side introduced evidence here. I got one person saying this is income. I got nothing else. But, Your Honor— If I can't come up with something to say there's some adequate, if you will, exposition of financial conditions, then I'm right there. There is no evidence. Well, I think in Adams, the court held that information is necessary because otherwise it would speculate. But it doesn't actually explain what constitutes information determining the financial condition and cites to various cases concerning defendant's net worth. And, again, in our case, we've got annual income, future earnings, and liabilities. And, Your Honor, the opposing counsel doesn't cite to a single case where the kind of testimony that we have put in is not deemed meaningful evidence. And it isn't just some person. It is the very person who was on the stand not once in terms of our putting her on as a hostile witness, but, again, on direct at the conclusion of the case. And the jury heard all of this, including her statements about her success as an agent and Tom's novels. So I think in this case, it is not a case where neither side has put in anything. If anything here, I think the amount of punitive damages could be subject to a remittitor. Do you expect that you're going to be able to even recover the $5.25 million in compensatory damages? Your Honor, it is my hope that when these works are free from interference, that there will be, at the very least, substantial royalties. There are royalties now of hundreds of thousands of dollars. And I just think that given the reprehensible behavior and the years of litigation that my clients have been subjected to, that to throw up our hands and say... Well, $5.25 million is not throwing up your hands. I mean, you may be walking away from $8 million in punitives, but that is not an insignificant amount of money. That is true. But I do think that there is a price to be paid for the conscious disregard of court after court who has decided this, and a jury who sat through five days of testimony and heard the numerous instances where she simply claimed she has the right to represent John Steinbeck. But if we send it back and tell the district court to consider remittitor and maybe give some sort of an evidentiary hearing on fashioning an appropriate amount of the punitives, you're just going to be back up here on appeal and the litigation will continue. If we send it back and simply strike the punitives, you'll have an enforceable $5.25 million judgment that you can start collecting on immediately. And I'm not trying to tell you how to litigate your case. I understand, Your Honor, and I would submit even a nominal amount of punitives in this circumstance.  Well, again, with all due respect, I think there is evidence in the record. Even if there is, we can't determine it. Understood, Your Honor. Okay. So I believe the jury award should be affirmed. Thank you. We'll give you a minute for rebuttal. Thank you, Judge Acuda. Just a few quick points. I think our ultimate point is along the lines of what Judge Smith said. Income is not the same as wealth. And there's absolutely no evidence of the defendant's wealth. And to Judge Talman's point earlier about what you normally see in these types of cases, you generally see some sort of witness testify, I've looked at the books, if it's a company, I've looked at the accounting statements, and this is the company's wealth or this is the defendant's wealth. The other side didn't seek information about Paladin. My understanding is that they did. My understanding also is they received some information. But if they didn't get the information that they wanted, they should have done what they should have done, is file a motion to compel, file a motion for sanctions, or file a motion for adverse inference if you're not going to produce the evidence. That's what normally occurs in litigation. Let me just touch on a couple of things in terms of the purported reprehensibility of, sorry. You've got four seconds. I do. Two things, Your Honor. The Grapes of Wrath deal was executed by the parties in February 2015 after the trial started. There was no interference in that. And I'll submit it. Thank you, Your Honors. All right. The case of Waverly-Scott-Kafaga v. Steinbeck is submitted, and we're adjourned for this session. Thank you both.
judges: Tallman, Ikuta, N.R. Smith